HOUSTON BELT & TERMINAL RAIL-
WAY COMPANY et al., Appellants,

v.

Joe W. WHERRY, Appellee.

No. 16755.

Court of Civil Appeals of Texas,
Houston (1st Dist.).

Dec. 2, 1976.

Rehearing Denied March 10, 1977.

Fulbright & Jaworski, John D. Gilpin, Osborne J. Dykes III, Thomas O. Matlock, Jr., Houston, for appellants.

Helm, Pletcher, Hogan & Burrow, George E. Pletcher, J. Donald Bowen, Houston, for appellee.

PEDEN, Justice.

Mr. Joe Wherry alleged in this libel action that the appellants had made a false written statement branding him a drug addict. His specific complaint was that on or about August 23, 1972, and prior thereto, the defendant, Houston Belt & Terminal Railway Company, acting through its agents and employees, T. Minahan, D. H. Montgomery, and Bill Robins, acting in the course and scope of their employment for defendant, Houston Belt & Terminal Railway Company, wrote, published and caused to be delivered a report that methadone had been found in plaintiff's system, and that this "is a synthetic drug commonly used in the withdrawal treatment of heroin addicts."

The appellants filed a general denial, denied that the report was maliciously made or was known by them to be untrue, and asserted that any statements made by them were qualifiedly privileged. Their trial amendment alleged that any statements made in the course of either a hearing, brief, appeal, or award of the Public Law Board, or any such body, would be absolutely privileged.

At the close of the evidence Wherry dismissed his action against Dr. Robins. In

response to special issues the jury found that 1) the defendant Railroad stated in writing that Wherry was a narcotics user in violation of Railroad Rule G, 2) such statements were false, 3) Wherry received an injury to his reputation or good name, 4) the statements made were a proximate cause of the injury to his reputation or good name, 5) the defendant acted with malice in regard to the statements made, 6) $150,000 would reasonably compensate Wherry for injuries suffered as a result of such statements, and 7) he should be awarded $50,000 against the Railway as exemplary damages.

The trial court overruled defendants' motion for judgment notwithstanding the verdict and their amended motion for new trial. They complain in twenty-five points of error.

Wherry was first hired by the Belt in September 1969 as a switchman. After working seven months he was drafted into the Army where he remained until December, 1971. He attended college for a semester, then returned to work as a switchman for the Belt in June, 1972. When the Belt allowed him to resume his position with full seniority, the union challenged this action and claimed time for another man every day that Wherry worked. On July 14, 1972, Wherry sustained a knee injury as he was attempting to climb on a fence to pass signals to other railroad employees. He sat down, then fainted, receiving cuts on his face. He was examined by Dr. Robins, the designated chief surgeon for the Belt, who treated his cuts and ordered two tests run by the hospital laboratory to learn why he had fainted: one for diabetes and the other, a drug screening, to see if the fainting was drug-related. The lab report was received by Dr. Robins on July 18 stamped "DRUG SCREEN METHADONE POSITIVE." Below the stamped word "METHADONE" appears the handwritten word "trace." Dr. Robins explained that a trace is a minute amount and that one test is not enough to indicate that Wherry was a drug user. He reported by telephone to Mr. Montgomery, superintendent of safety and assistant manager of personnel for the Belt and the official to whom Dr. Robins customarily reported, that "we had obtained a positive methadone, with a trace" and that "methadone was a drug which was used usually in treating heroin addicts, to get them off of heroin and onto the methadone." He told Montgomery he couldn't say this means anything, but it might be investigated further. He intended to convey only the possibility that Wherry was a heroin or methadone user, not that he was a user. Dr. Robins testified that methadone will show up in one's urine for only about twenty-four hours. At Montgomery's request Dr. Robins furnished a narrative report dated July 24, 1972. Its pertinent contents will be later quoted as writing # 1.

On July 19, 1972, after talking to Dr. Robins, Montgomery had prepared a written report describing Wherry's accident, his injuries, and the telephone conversation with Robins. Montgomery's report will be quoted later, in part, as writing # 2. The report was sent to seven Belt officials, including Superintendent O. R. Adams. Each received it by reason of his position and duties at the Belt. This was the reporting procedure usually followed for any accident that resulted in loss of time.

On July 21, Dr. Robins released Wherry to return to work, but the Belt suspended him the same day by letter from O. R. Adams, pending a formal investigation into his alleged injury. The "investigation", or hearing, was held on August 1. Wherry first heard of the methadone finding when Montgomery read the doctor's report and his own report at the hearing. He then had another urinalysis run for drugs in his system. The report on that test was made by a Dr. John Spikes and was received by the Belt on August 7; it stated that Wherry's urine sample revealed the presence of a compound whose characteristics resembled methadone, but that further analysis showed that the compound was not methadone or any of the commonly employed drugs of abuse. Wherry testified that he had never taken heroin, methadone, or any narcotics. On August 9, Wherry was dismissed for being an unsafe employee and

for failure to timely report his accident even though, as we will see, the elapsed time was very short. He was not dismissed for violation of Rule G, which provides that the use of intoxicants or narcotics is prohibited.

After his discharge from the Belt, Wherry sought assistance from the Veterans' Administration on the grounds that he was discharged without cause. Mr. Merle Rider of the U. S. Department of Labor wrote defendant Mr. Minahan asking about Wherry's discharge. Minahan replied by letter dated August 23, 1972, that Wherry was dismissed for violation of safety and accident reporting rules and making another statement which we will notice as writing # 3.

Wherry appealed his discharge under the Railway Labor Act, and his dismissal was affirmed by Public Law Board No. 1259 on November 13, 1974. The Board was convened as an arm of the National Railroad Adjustment Board under authority of Public Law 89–456, 45 U.S.C. § 153. Its three members were Mr. Minahan, representing the Belt, Mr. A. J. Cotton, representing the union and Wherry, and Mr. Burl E. Hays, a neutral member appointed by the National Mediation Board.

The award was filed with the National Mediation Board. It will be quoted as writing # 4 later. It was signed by Hays and Minahan. Cotton did not sign it.

We look first to these points of error:

9. "The trial court erred in submitting Special Issue No. 1, over proper objection, because there was no evidence that any defendant stated in writing that plaintiff was a drug user.

10. "The trial court erred in overruling defendants' amended motion for new trial because the evidence was factually insufficient to support the jury's affirmative answer to Special Issue No. 1.

11. "The trial court erred in submitting Special Issue No. 2, over proper objection, because there was no evi-

dence that defendants' statements were substantially false.

12. "The trial court erred in overruling defendants' amended motion for new trial because the evidence was factually insufficient to support the jury's affirmative answer to Special Issue No. 2."

These are the excerpts from the four writings in evidence (referred to above) which must be looked to in reviewing this case:

1. Montgomery's July 19, 1972, accident report. Only pertinent part:

"Laboratory results of the urine specimen was positive for methadone, which is a synthetic drug commonly used in the withdrawal treatment of heroin addicts."

2. Dr. Robins' letter on the lab results sent to Montgomery on July 24, 1972. Pertinent part:

"The Drug screening test was positive for Methadone. Methadone is a drug which is often used to give heroin addicts since it has essentially the same effects as heroin, but is much less expensive. It can in some doses produce syncope  .  .  ."

3. Minahan's letter of August 23, 1972, to Mr. Rider of the U. S. Department of Labor, set out above:

"It was also determined by the Doctor who examined Mr. Wherry following his injury, caused when Mr. Wherry passed out and fell, that traces of methadone were present in Mr. Wherry's system, which constitutes grounds for discharge under Uniform Code of Operating Rules, Rule G."

4. The Public Law Board award, dated November 13, 1974. Pertinent part:

"Carrier should not have removed Claimant Wherry from service prior to the investigation in view of the above facts. The Board will therefore allow Yardman Wherry pay for all time lost commencing July 21, 1972, until August 23, 1972, the date he was dismissed by the Carrier.

"The testimony at the investigation disclosed that Claimant was, in fact, responsible for his accident in that he was 'un-

der the influence of' or 'had been using' a drug known as methadone. This, in the Board's opinion, was sufficient justification for his dismissal, even though he was not formally charged with violation of Rule G of Carrier's Uniform Code of Operating Rules."

We think it clear that Dr. Robins' letter was not libelous, and did not fit the inquiry in Issue No. 1, and we do not believe the jury considered it did so in answering the issues.

Wherry contends that the first writing listed above, Montgomery's report, was libelous because it implied that he was using methadone and was a heroin addict, it failed to reflect Dr. Robins had said that only a trace was shown and that further investigation was needed. Wherry argues that the implication was plain and it was false. Montgomery testified during the trial that Wherry could not, in good faith, have been accused of being a narcotic user.

We have noted that the third writing listed, Minahan's letter of August 23, 1972, was written in response to Mr. Rider's August 17, 1972 inquiry on behalf of Wherry as to whether he had been discharged without cause in violation of his reemployment rights as a veteran. Minahan's reply, set out above, stated that the doctor determined that traces of methadone were found in Wherry's system and that this constitutes grounds for dismissal under Rule G. We conclude that since Rule G prohibits the use of narcotics, the jury was entitled to conclude from this letter that Minahan was stating for the Belt that Dr. Robins had found traces of methadone in Wherry's system, so Wherry had used narcotics in violation of Rule G. This despite Minahan's testimony during the trial that it would have been false to suggest that Wherry was in violation of Rule G, and despite the fact that the Belt had, two weeks earlier, received Dr. Spikes' report that further analysis of an August 1 test showed that the compound in Wherry's test was not methadone or any of the commonly employed drugs of abuse.

We are inclined to the view that the award of the Public Law Board, listed as the fourth writing above, was absolutely privileged. Absent an objection to its admission or a request for an instruction to the jury that it was a privileged communication, and in view of other evidence of libel in the record, we cannot say the trial court erred in allowing the jury to consider it.

Under their points of error 9 and 10, complaining of the submission of Special Issue No. 1 based on no evidence and insufficient evidence, the appellants contend that the various writings introduced into evidence were not ambiguous, that as a matter of law they did not state that Wherry was a narcotics user, and therefore they were not actionable as libelous. Clearly, the defendants did not use the exact words asked about in the first issue.

The determination of the meaning of language that is ambiguous or of doubtful import is the province of the jury. The test is: What effect would the publication have upon the mind of the ordinary reader? *Guisti v. Galveston Tribune*, 105 Tex. 497, 150 S.W. 874 (1912); *Sears, Roebuck and Company v. Coker*, 428 S.W.2d 710 (Tex.Civ. App.1968, writ ref. n. r. e.); 36 Tex.Jur.2d 482, Libel and Slander § 156.

We consider Montgomery's report, Minahan's letter, and the Public Board award to be capable of the interpretation inquired about in the first special issue and hold that there was sufficient evidence to support the jury's answer to it. There is evidence that the recipients of the various writings gave the same import to the language as did the jury. Montgomery's report was sent to seven Houston Belt officials including Superintendent Adams. Wherry testified that when he returned to work after the injury it was Adams who told him that he was being withheld from service pending an investigation, and Adams wrote Wherry a letter to that effect. Although Adams did not mention the use of narcotics, it may be assumed that as superintendent of the Belt he was familiar with the rule that no yardman would be removed

from his job prior to an investigation except for just and sufficient cause, such as a violation of General Rule G or an act of violence. The evidence indicates that Montgomery's report caused Adams to believe Wherry was a narcotics user. We overrule points nine and ten. The next points concern the second issue.

Special Issue No. 2 reads:

"Do you find from a preponderance of the evidence that such statements, if any, were substantially false and untrue?"

■ Wherry testified that he had not used methadone and that when he left the service he passed a test which indicated he had not been using narcotics. Dr. Spikes' letter stated that on the basis of his test on August 1 there was no methadone or drugs of abuse in Wherry's system. Dr. Robins testified that the drug screen on the urinalysis was run with a number of others, some three days after the accident. We have noticed Dr. Robins' testimony that the technician's report did not give enough information on which to form a sensible opinion as to the test and how it applied to Wherry. He said it was a bare investigation (it would bear investigation?) and that he did not intend to give the impression or suggest that Wherry was a heroin or methadone user.

We overrule the appellants' eleventh and twelfth points.

The appellants' fifth point of error is that the trial court erred in submitting Special Issue No. 1, over proper objection, because it is prejudicially multifarious and is not limited to any particular writing. They argue that each writing, if defamatory, gives rise to a separate and distinct cause of action and say it follows that a plaintiff has the burden of establishing each element of his case with regard to each writing, so the defendant has the right to a determination of his defenses with regard to each. The exact wording of the first special issue was:

"Do you find from a preponderance of the evidence that the Defendant Railroad stated in writing that Joe Wherry was a narcotics user in violation of Railroad Rule G?"

The jury was given this definition:

"By the term 'DEFENDANT RAILROAD,' as used in this charge, includes the agents, representatives, officers, doctors and employees of the Houston Belt & Terminal Railroad Company, other than the Plaintiff, Joe Wherry."

The appellee's reply is that since the adoption of revised Rule 277, Texas Rules of Civil Procedure, Texas courts have unanimously given wide discretion to the trial judge to submit issues either separately or broadly.

Rule 277 states in part:

"It shall be discretionary with the court whether to submit separate questions with respect to each element of a case or to submit issues broadly. It shall not be objectionable that a question is general or includes a combination of elements or issues."

Prior to the 1973 amendment of Rule 277, our issues in negligence cases were required to be submitted separately and distinctly when the special issue form of submission was used. Our Supreme Court stated in *Haas Drilling Co. v. First National Bank in Dallas*, 456 S.W.2d 886 (Tex.1970):

"In his 1969 Supplement on Special Issue Submission in Texas, Hodges notes the distinction in special issue submission in negligence and non-negligence cases; at page 71, he states: 'Since *Roosth & Genecov Production Co. v. White*, 152 Tex. 619, 262 S.W.2d 99 (1953), it is quite clear that there will be no reversal in non-negligence cases simply because the issue is too broad or too small. The trial court has almost complete discretion, so long as the issue in question is unambiguous and confines the jury to the pleading and the evidence.' In fact, the opinion in *Roosth & Genecov Production Co.* (a negligence case) said: 'We hold it was reversible error to submit the issues in question in the form used and that on the next trial separate issues should be submitted for each item of defectiveness alleged and

proved. *At the same time we do not consider that we are overruling City of Houston v. Lurie* [148 Tex. 391, 224 S.W.2d 871 (1949)] *or Howell v. Howell* [147 Tex. 14, 210 S.W.2d 978 (1948)] *or even limiting their effect in cases other than those of negligence to which they might be applicable.'* "

The appellants say that the courts have not relied upon the formalistic "distinct and separate" rule of *Fox v. Dallas Hotel Co.,* 111 Tex. 461, 240 S.W. 517 (1922), in libel cases, citing *Houston Press Co. v. Smith,* 3 S.W.2d 900 (Tex.Civ.App.1928, writ dism'd); *Times Publishing Co. v. Ray,* 1 S.W.2d 471 (Tex.Civ.App.1927), aff'd Tex.Com.App., 12 S.W.2d 165 (1929); *Bell Publishing Co. v. Garrett Engineering Co.,* 141 Tex. 51, 170 S.W.2d 197 (1943), and *Fitzjarrald v. Panhandle Publishing Co.,* 149 Tex. 87, 228 S.W.2d 499 (1950). We note that each of these cases was decided prior to *Roosth & Genecov Production Co. v. White,* supra. *Fitzjarrald,* supra, held:

"If the pleadings and evidence in a case raise the issue as to whether an article published contains statements that are privileged and statements that are libelous per se, proper questions relating to such statements should be submitted to the jury. All statements that are privileged should be submitted to the jury for them to determine whether they were published with malice, and all statements libelous per se should be submitted to the jury for them to determine whether they are true or false. Each statement should be submitted separately. Respondent had the right to have the jury pass upon each statement separately, and if damages were recoverable, the instruction of the court should have limited the damages recoverable to those resulting from the publication of the privileged statements found to have been published with malice and the publication of those statements libelous *per se* found to be false."

In our case the jury found that the statements were false and that the defendant acted with malice in making them.

We said in *Members Mutual Insurance Co. v. Muckelroy,* 523 S.W.2d 77 (1975, writ ref. n. r. e.):

"Under the revised rule, where the broad form of submission is adopted, the extent of the jury's consideration of the elements comprising the controlling issue becomes a matter of evidence and argument, subject to appropriate instruction of the court."

See *Mobil Chemical Co. v. Bell,* 517 S.W.2d 245 (Tex.1974); *Shasteen v. Mid-Continent Refrigerator Co.,* 517 S.W.2d 437 (Tex.Civ. App.1975, writ ref. n. r. e.); Pope & Lowerre, Revised Rule 277–A, Better Special Verdict System of Texas, 27 S.W.L.J. 577 (1973). We believe it is discretionary with the trial court in libel cases to submit separate questions with respect to each element of the case or to submit issues broadly, and that in our case the trial court did not abuse that discretion. We think the matter could have been more easily submitted by issues inquiring as to each of the writings upon which the plaintiff could have recovered, but we cannot say Special Issue No. 1 could not have been properly submitted with limiting instructions, cumbersome though they might have been.

The appellee argues that there is evidence that there was libel, that it was published, and that it was malicious. He says damages flowed from the over-all conduct of the appellants and there were not separate damages for each particular writing which libeled him. "The damages were all the result of the careful plan the Railroad devised to fire Joe Wherry. Mr. Wherry lost his job and was branded a narcotics user regardless of which writing appellants want examined. The damages which flow from those acts are the same regardless of which writing is involved."

The plaintiff did not obtain jury findings as to a conspiracy among the individual defendants or as to their having made libelous writings. We overrule the appellants' fifth point, but we sustain their fourth one, which complained of the overruling of the motion for judgment notwithstanding the verdict as to defendants Mont-

gomery and Minahan. Judgment should not have been entered against them individually.

The appellants contend in their second and third points of error that the trial court erred in refusing to submit any issue on publication of the allegedly defamatory writing and in overruling their motion for judgment notwithstanding the verdict because there was no evidence of publication. We overrule these points.

■■■ Publication of defamatory words means to communicate orally or in writing or print to some third person capable of understanding their defamatory import and in such a way that he did so understand. 36 Tex.Jur.2d 317, Libel and Slander § 32.

Publication is an essential element of a libel action. Without publication there is no libel. *Lyle v. Waddle,* 144 Tex. 90, 188 S.W.2d 770 (1945).

■■■ There was evidence of publication. Montgomery's report was sent to seven persons, and it was read at the investigation. Minahan's letter was mailed to and apparently received by Rider. It may be presumed from Adams' action that he received the letter from Montgomery.

The appellants' first point of error is: "The trial court erred in denying defendants' motion for judgment n. o. v., because all defendants' writings were at least conditionally privileged and there was no evidence of actual malice."

Their sixth point is:

"The trial court erred in submitting Special Issue No. 1, over proper objection, because it allowed the jury to consider as a defamatory writing the Public Law Board Award, which was absolutely privileged."

In *Denton Publishing Company v. Boyd,* 460 S.W.2d 881 (Tex.1971), the Supreme Court stated:

"Privilege is an affirmative defense in the nature of confession and avoidance; and, except where the plaintiff's petition shows on its face that the alleged libelous publication is protected by a privilege, the defendant has the burden of proving that the publication is privileged. . .

"Where the facts are undisputed and the language in the publication is not ambiguous, the question of privilege is one of law for the court. . . .

"It is for the jury, however, to resolve any dispute in the evidence as to the circumstances under which the publication was made. . . ."

The trial court refused to submit these issues submitted by the appellants:

Special Issue No. A

Do you find from a preponderance of the evidence that all defendants' statements in writing reflected in Exhibits No. _____ were substantially true?

Answer "We do" or "We do not."

If you have answered Special Issue No. A "We do" and only in that event, then answer:

Special Issue No. B

Do you find from a preponderance of the evidence that the defendants acted in good faith, pursuant to a duty to report to another party with a common business interest?

Answer "We do" or "We do not."

Requested Special Issue No. A differs from submitted Issue No. 2 in that the burden of proof was placed on the plaintiff in Issue No. 2 as submitted to the jury:

Do you find from a preponderance of the evidence that such statements, if any, were substantially false and untrue?

■■■ The trial judge did not err in refusing to submit them. Issue No. A was the same ultimate issue in a different form, and since Special Issue No. B was conditioned on Special Issue A, it was not error to refuse it. The appellant has waived any findings of privilege. Rule 279, Texas Rules of Civil Procedure.

The appellants' next points are that the trial court erred:

7. in refusing to submit any issue concerning fault, as required by the First and Fourteenth Amendments to the United States Constitution.

8.  in submitting Special Issue No. 5 concerning malice, because such issue did not properly submit the question of fault.

The trial court gave this definition of malice:

"You are instructed that 'malice' is defined as follows: Ill will, bad or evil motive, or such gross indifference to the rights of Plaintiff as amounted to a willful or wanton act done intentionally and without just cause or excuse on the part of the party accused of such acts."

The only objection made to this instruction was as follows:

"(f) With regard to the definition of malice, defendants specially object to the clause following a willful or wanton act, which reads 'Done intentionally and without just cause or excuse on the part of the party accused of such acts,' in that the same in inquiring about an excuse would attempt to shift the burden to the defendant, whereas the plaintiff has the burden on this issue."

The appellants contend that the First Amendment to the United States Constitution places upon the plaintiff in a defamation case the burden of obtaining a finding of truth-related fault on the part of defendant. They cite *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1975), and say that a finding of malice as required in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), or a finding of gross negligence or of simple negligence would satisfy this requirement. They also contend that Texas law requires proof of actual malice in a libel action when the writings are conditionally privileged, that is, proof of knowing falsity or reckless disregard of the truth.

The Texas Supreme Court in *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809 (1976), interpreted recent findings of the Supreme Court that establish differing standards of care applicable to various classes of defamation plaintiffs. In speaking of *Gertz*, the Texas Supreme Court stated:

"The effect of the Court's holding that states may not impose liability without fault on publishers and broadcasters of defamatory falsehoods is to sanction a simple negligence standard as complying with the minimum requirements of the First and Fourteenth Amendments.

"As a further limitation upon the right of private individuals to recover in libel actions against publishers or broadcasters of defamatory falsehoods, the Court held in *Gertz* that a private individual 'who establishes liability under a less demanding standard than that stated by New York Times may recover only such damages as are sufficient to compensate him for actual injury.' 418 U.S. 323 at 350, 94 S.Ct. 2997 at 3012. . . ."

Texas has thus adopted the negligent standard of liability coupled with the actual injury requirement in *Gertz* as applied to defamation suits against media defendants.

Further, both Montgomery and Minahan have admitted that a good faith accusation could not have been made and it would be false to say that Wherry was a narcotics user or that he violated Rule G. We think the jury was entitled to conclude from the evidence that they made false statements in writing that he was a narcotics user when they knew better.

The appellants did not object to the charge on the basis of improper submission of the question of fault. They have waived this question. Rule 274, Texas R.C.P.

The appellants' thirteenth through eighteenth points of error are that the trial court erred in submitting Issues 3, 4, and 6 over proper objection because there was no evidence to support them and in overruling defendants' motion for new trial because the evidence was factually insufficient to support the jury's findings to Issues 3, 4, and 6. They argue that under the standards set in *Gertz v. Robert Welch, Inc.*, supra, the plaintiff in a libel suit must prove actual damage caused by the libel. Also, that he is not entitled to recover for damages that are speculative and remote, citing *Denton Publishing Company v. Boyd*,

448 S.W.2d 145 (Tex.Civ.App.1969), aff'd Tex., 460 S.W.2d 881 (1971).

"Compensatory damages allowable for defamation are either general or special. General damages are those that naturally, proximately, and necessarily result from the libel or slander. The law infers or presumes them, and they are recoverable under a general averment and without proof that they have been incurred. They include injuries to character or reputation, injuries to feelings, mental suffering or anguish, and other like wrongs and injuries incapable of money valuation. General damages are neither remote nor speculative." 36 Tex.Jur.2d., Libel and Slander, 394–95, General and Special Damages § 94.

■ Damages for loss of employment are regarded as special damages and are recoverable where the loss was caused directly by the publication and circulation of the libel complained of. *Mayo v. Goldman*, 57 Tex.Civ.App. 475, 122 S.W. 449 (1909, no writ).

The jury made affirmative answers to Issues 3 and 4, which asked:

3. "Do you find from a preponderance of the evidence that the Plaintiff received an injury to his reputation or good name?

4. "Do you find from a preponderance of the evidence that the statements made were a proximate cause of the injury to Plaintiff's reputation or good name?"

The jury's answer to Special Issue No. 6 was $150,000. It asked:

"What sum of money, if any, do you find from a preponderance of the evidence, would reasonably compensate Plaintiff for injuries, if any, suffered as a result of such statements, if any"

"Answer in dollars and cents, if any. You are instructed that you are to take into consideration the following elements of damage and none other:

(1) Injury to character reputation

(2) Mental suffering or anguish

(3) Financial injury to Plaintiff's business or occupation."

■ Assuming *Gertz* and *Foster* apply only to media defendants, under the common law and Article 5430, V.T.C.S., injury to Wherry's reputation is presumed, and with that injury presumed, his mental anguish may be taken into consideration in awarding damages. *Renfro Drug Co. v. Lawson*, 138 Tex. 434, 160 S.W.2d 246 (1942). The appellants did not object to "financial injury" being considered in Special Issue No. 6.

■ We have considered all the evidence in this case and we conclude that it adequately supports the jury's answers to Issues 3, 4, and 6.

Points of Error Nineteen through Twenty-two are that the trial court erred in:

19. submitting Special Issue No. 5, over proper objection, because there was no evidence that any defendant acted with malice toward the Plaintiff.

20. overruling defendants' amended motion for new trial because the evidence was factually insufficient to support the jury's finding of malice in response to Special Issue No. 5.

21. submitting Special Issue No. 7, over proper objection, because there was no evidence to justify an award of punitive damages.

22. overruling defendants' amended motion for new trial because the evidence was factually insufficient to support the jury's award of $50,000 as punitive damages."

■ Contrary to the common law rule, a libelous publication is actionable under Article 5430, Vernon's Texas Civil Statutes, without proof of malice, regardless of whether it is libelous per se. *Gibler v. Houston Post Co.*, 310 S.W.2d 377 (Tex.Civ. App.1958, writ ref. n. r. e.). However, where an action is based on a conditional or qualifiedly privileged publication, the plaintiff has the burden of proving that the publication was made with malice or a want of good faith to establish a cause of action.

In such cases:

"Although the existence of actual or express malice is not presumed as a matter of law and must be proved, it need not be proved by direct or extrinsic evidence; its existence is sufficiently shown by evidence of facts and circumstances from which it is reasonably inferable. It may be inferred from the relation of the parties, the circumstances attending the publication, the language used, and from the words or acts of the defendants before, at, or after the time of the communication; but there must be evidence from which the jury can infer malice existing at the time of publication and actuating it. Malice is not implied or presumed from the mere fact of the publication, nor may it be inferred alone from the character or vehemence of the language used, nor found from the falsity of the statement alone." 36 Tex.Jur.2d 475, Libel and Slander § 149.

■ Since the appellants waived any finding that the publication was qualifiedly or conditionally privileged, it is only in connection with the award of exemplary damages that we must consider whether there was sufficient evidence that the defendants acted with malice toward the plaintiff.

"The character of malice that must be shown to warrant the recovery of exemplary damages is not entirely clear. Generally, it is said that the malice must be actual or express, and not merely imputed. On the other hand, it has been held that malice implied or inferred from the wrongful act committed is sufficient. Possibly resolving these apparent inconsistencies, it has been said that necessary malice may be shown by evidence of personal ill will or animosity on the part of the defendant toward the plaintiff, or it may be inferred where the libelous article was recklessly or carelessly published, that in some cases this is referred to as 'express malice' and others as 'implied malice,' and that this distinction is in name rather than in fact because it is malice whether it is proved by direct evidence in the one case, or inferred from recklessness or carelessness in the other."

36 Tex.Jur.2d 398, § 95, Libel and Slander.

The appellants contend that all the testimony concerning the various writings indicates that no one involved with them exhibited any ill-will or malice toward Wherry, that all the writings in evidence were authored in good faith, and that the communications were all between and among persons who had a strong common interest in truthful reporting of the accident facts. Further, that they have been fair to Wherry and even risked the ire of the railroad union by granting Wherry his seniority when he returned from the Army.

At the time of Wherry's accident, Montgomery was the superintendent of safety and assistant manager of personnel. He later resigned this position, exercised his seniority under the labor contract, and became a railroad switchman, the same type of job Wherry had before his suspension. We have already noted Montgomery's admissions concerning lack of good faith in accusing Wherry of being a narcotics user and his failure to report that there was only a "trace" of methadone and that there needed to be a further investigation.

Although Minahan's letter, written as director of labor relations, stated that a doctor had determined that traces of methadone were present in Wherry's system and that this constituted grounds for discharge under Rule G, Minahan testified that it would be a false charge to accuse him of being a drug user and to fire him for a Rule G violation. Minahan was present during the taking of Robins' deposition when Robins said he would never accuse Wherry of being a user of narcotics, yet Minahan later signed and approved the board award stating Wherry was under the influence of or had been using methadone and that this was sufficient justification for his dismissal. There was also evidence that the Belt had a continuing problem with the union while Wherry remained in its employ. Also, in presenting evidence during the hearing, Minahan failed to present the pathologist's report that Wherry did not have methadone in his system.

We suggest only that the jury was entitled to consider the evidence in this light, not that it must. We find the evidence supports the jury's answers to Issues 5 and 7.

Appellants state in their next two points of error that the trial court erred in sustaining plaintiff's hearsay objection to Belt's exhibit 5, Dr. Robins' letter of August 10, 1972, and his objection to the first six pages of Belt's exhibit 4. They argue that both exhibits were offered to show their good faith or lack of malice and were admissible under Article 5431, V.T.C.S. They say that it is not violative of the hearsay rule to admit evidence of written communications not offered to prove the truth of the facts stated therein, but only to show by inference the state of mind of the person who authorized the writing.

Article 5431 provides:

"In any action for libel, in determining the extent and source of actual damage and in mitigation of exemplary or punitive damage, the defendant may give in evidence, if specially pleaded, all material facts and circumstances surrounding such claim of damage and the defense thereto, and also all facts and circumstances under which the libelous publication was made, and any public apology, correction or retraction made and published by him of the libel complained of, and may also give in evidence, if specially pleaded in mitigation of exemplary or punitive damage, the intention with which the libelous publication was made. The truth of the statement, or statements, in such publication shall be a defense to such action."

Belt exhibit 5 was a letter Dr. Robins wrote to Montgomery on August 10, 1972, saying he had consulted a pathologist about the validity of the drug screen urinalysis that showed a positive reaction for methadone and that the pathologist knew of no compound which would produce the same test as methadone. The defendants have consistently taken the position that it was incorrect, unfair, and not in good faith to accuse Wherry of being a user.

Belt exhibit 4 was part of the Belt's brief prepared for the Public Law Board tending to show that the Belt's position before the Board was that Wherry had been fired for violating safety rules, not Rule G. The part offered was repetitious of other evidence.

We hold that the trial judge did not abuse his discretion in excluding these exhibits. We do not consider either of them particularly significant and conclude that the error, if any, probably did not result in an improper judgment. Rule 434.

The last point of error is that the trial court committed fundamental error in entering judgment upon a purported cause of action for libel because the Texas libel statute is unconstitutional under the First and Fourteenth Amendments to the U. S. Constitution. We find no merit in this point.

The judgment of the trial court is reformed to delete the recovery against defendants Montgomery and Minahan individually. As thus reformed, it is affirmed.